**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SONDRO VELEZ,**

                                        **Plaintiff,**

        **vs.**                                          **1:11-CV-1487**
                                                         **(MAD)**

**MICHAEL ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

Erwin, McCane & Daly                    Thomas C. Erwin, Esq.
25 Elk Street
Albany, New York 12207
_Attorneys for Plaintiff_

Social Security Administration          Peter W. Jewett, Esq.
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Attorney for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

        Plaintiff Sondro Velez brings the above-captioned action pursuant to 42 U.S.C. § 405(g)

of the Social Security Act, seeking a review of the Commissioner of Social Security's decision to

deny his application for child's insurance benefits based on disability and supplemental social

security income ("SSI").

**BACKGROUND**

In June 1994, plaintiff was found to be disabled with benefits continuing until his marriage in September 1996. (T.34).[1]  On March 16, 2002, plaintiff's marriage ended in divorce. On April 25, 2008, plaintiff filed applications for Child's Income based upon a disability before age 22 and for SSI . (T. 133-135).  Plaintiff was 32 years old at the time of the applications with no past work experience.  (T.39, 170).  Plaintiff dropped out of school in the ninth grade and later obtained his GED while incarcerated. (T. 41).  Plaintiff alleges that he is disabled due to post traumatic stress, anxiety disorder, learning disability and depression. (T.169).

On January 15, 2009, plaintiff's applications were denied and plaintiff requested a hearing by an ALJ which was held on September 8, 2010. (T. 34, 80).  On September 23, 2010, the ALJ issued a decision denying plaintiff's claim for benefits.  (T. 34-42).  The Appeals Council denied plaintiff's request for review on October 27, 2011, making the ALJ's decision the final determination of the Commissioner. (T. 1-3).  This action followed.

## DISCUSSION

"Under s 202(d)(1)(B), which establishes the general eligibility requirements for child's insurance benefits, the applicant must be 'unmarried' at 'the time such application was filed'". 42 U.S.C. s 402(d)(1)(B) (1976). "Once a person satisfies this eligibility requirement and begins to receive benefits, the statute provides for the termination of these benefits 'in the month in which such child dies or marries'". *McMahon v. Califano*, 605 F.2d 49, 52 (2d Cir. 1979) (citing 42 U.S.C. s 402(d)(1)(D)).  Even though a person's benefits are terminated, however, he may become re-entitled to benefits if he satisfies the requirements of  42 U.S.C. § 402(d)(6)(1976).

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any

---

[1] "(T.)" refers to pages of the Administrative Transcript, Dkt. No. 8.

2

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability

claims:

> "In essence, if the Commissioner determines (1) that the claimant is
> not working, (2) that he has a 'severe impairment,' (3) that the
> impairment is not one [listed in Appendix 1 of the regulations] that
> conclusively requires a determination of disability, and (4) that the
> claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type
> of work the claimant can do." The claimant bears the burden of
> proof on the first four steps, while the Social Security
> Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the

factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*,

221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Id.*  The Court may also set

aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d

72, 77 (2d Cir. 1999).

On September 23, 2010, the ALJ found at step one that plaintiff has never engaged in

substantial gainful activity. (T. 39).  At step two, the ALJ concluded that plaintiff suffered from

PTSD, a dysthymic disorder, borderline intellectual functioning, a transitional L5 vertebral body

and polysubstance abuse in reported remission since August 2008 which qualified as a "severe

impairments" within the meaning of the Social Security Regulations (the "Regulations").  (T. 39).

At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 39). The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform medium work which is primarily comprised of simple, rote tasks in a low-contact environment and concluded that plaintiff could lift/carry up to 50 pounds occasionally, 25 pounds frequently and sit, stand and/or walk for six hours in an eight hour workday. (T. 39). At step four, the ALJ concluded that plaintiff did not have any past relevant work. (T. 41). At step five, relying on the medical-vocational guidelines ("the grids") set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T. 41). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 42).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the Commissioner erred when he failed to find that plaintiff's severe impairments met or equaled the level of any listed impairment; (2) the RFC analysis is unsupported by substantial evidence; and; (3) the ALJ should have elicited testimony from a vocational expert. (Dkt. No. 11).

## RELEVANT MEDICAL EVIDENCE

In August 2008, plaintiff was released from prison after being confined for two years for attempted robbery. (T. 276). On September 11, 2008, plaintiff appeared at Ulster County Mental Health Department seeking to "get back on [his] medication" and to "get counseling" since his release from prison. Plaintiff complained of depression, sleep problems, nightmares and a history of sexual abuse. Plaintiff also described a history of alcohol and substance abuse including alcohol, marijuana, cocaine and crack cocaine that began at age 8 or 9. Plaintiff stated

that he previously attended rehabilitation, AA meetings and NA meetings.  Plaintiff was previously hospitalized for one suicide attempt.  (T. 274).

During the visit, plaintiff was examined by Kathleen Collins, LCSW who found that plaintiff was cooperative, articulate, made good eye contact, was organized, coherent and appeared appropriate.  Plaintiff was not delusional and denied experiencing hallucinations.  (T. 277).  Plaintiff was diagnosed with marijuana, cocaine and alcohol dependency in remission and PTSD.  Plaintiff presented a Global Assessment of Functioning ("GAF") score of "45".  Collins noted that group drug treatment would be determined after receipt of the urine analysis.  There are no further records from Collins or the Ulster County Mental Health Department.

On December 11, 2008, Steven Rocker, M.D. examined plaintiff at the request of the agency.  Plaintiff indicated that he suffered from back pain, hypertension and asthma.  Dr. Rocker performed an Internal Medicine Examination and found that plaintiff was not in acute distress, his gait was normal, he could walk without difficulty and needed no assistance climbing on/off the examination table. Plaintiff displayed full range of motion in the cervical spine, lumbar spine, shoulders, elbows, hips and legs, straight leg raising was negative and upper and lower extremity strength was 5/5. (T. 285).  A pulmonary function test was administered and showed no impairment.  Dr. Rocker concluded that plaintiff had no limitation for hearing, speaking, sitting, standing, handling or walking.  The doctor noted, "per symptoms, mild limitation for lifting and carrying". (T. 286).

On December 11, 2008, Alex Gindes, Ph.D. completed a Psychiatric and Intelligence Evaluation at the request of the agency.  Plaintiff stated that he was hospitalized twice in the 1990s for mental issues.  Plaintiff indicated that he had been prescribed a variety of anti-psychotic and anti-anxiety medications but at the time of the examination, he was not taking any

medications. (T. 279). Dr. Gindes found that plaintiff could follow and understand simple instructions and directions and perform simple tasks independently. However, plaintiff was not likely to maintain attention and concentration or maintain a regular schedule. (T. 281). Dr. Gindes also noted that plaintiff was not always able to learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, or appropriately deal with stress. Dr. Gindes' related plaintiff's difficulties to his depression, anger and inattention. Dr. Gindes also found that plaintiff's full scale IQ was 70. Dr. Gindes diagnosed plaintiff with Bipolar Disorder, alcohol/marijuana dependency in remission, borderline intellectual functioning, personality disorder with antisocial features. (T. 295).

On January 13, 2009, H. Ferrin, a state agency analyst, completed a Psychiatric Review Technique based upon Listings 12.02, 12.04, 12.08 and 12.09. (T. 297). Ferrin found that plaintiff did not have a medically determinable impairment that satisfied the criteria for those listings. With respect to the Paragraph "B" criteria, Ferrin found that plaintiff exhibited mild limitations in activities of daily living; moderate limitations in social functioning/maintaining concentration, persistence or pace; and no episodes of deterioration. (T. 307-308). Ferrin also completed a Mental RFC assessment reiterating the findings in his Psychiatric Review. (T. 320). Ferrin opined that plaintiff was able to understand and remember simple instructions and sustain concentration for simple tasks. Ferrin recommended a low contact setting for plaintiff. (T. 321).

On January 13, 2009, S. Kerner, a state agency consultant, completed a Physical Residual Functional Capacity Assessment. (T. 312). Kerner found that plaintiff had no exertional limitations, postural limitations, manipulative limitations, visual limitations, communicative limitations or environmental limitations. (T. 314).

From May 2009 through July 2010, plaintiff treated with Dr. Robert Roth.  Plaintiff initially appeared for medications for anxiety, pain, blood pressure and a referral for behavioral health.  On examination, plaintiff's skin was clear without evidence of jaundice with multiple professional tattoos.  Plaintiff's back was straight with no spasm or deformity.  Plaintiff received prescriptions for medication and for an MRI of his lumbar spine.  Plaintiff was diagnosed with PTSD, low back pain and panic disorder without agoraphobia. (T. 334).  In September 2009, plaintiff appeared for a physical examination and exhibited no spasm or deformity in his back. (T. 338).  Plaintiff could not have an MRI performed due to a bullet in his left groin area.  Plaintiff was diagnosed as obese with "a history of orthopedic problems lifelong".  (T. 338).   On January 11, 2010, plaintiff complained of low back pain.  Plaintiff's physical examination was normal and he was diagnosed with low back pain and referred to orthopedics. (T. 352). The majority of plaintiff's subsequent visits were for prescription refills.  During those visits, plaintiff's physical examinations were normal and his diagnosis remained the same.

On May 27, 2010, plaintiff was evaluated by Lisa Conquet, LMSW (licensed master social worker), at Dr. Roth's request. (T. 370).  Ms. Conquet noted that plaintiff had not been in counseling since he was released from jail.  Plaintiff reported depression, anxiousness and sadness stemming from low self-esteem and PTSD about sexual abuse as a child.  Upon examination, plaintiff was noted as oriented, neat, cooperative, coherent and agitated.  Plaintiff did not present with any delusional thoughts or hallucinations.   Plaintiff's immediate recall was intact but his remote memory was impaired and plaintiff stated he was "tripping on acid" when he was 17 and arrested for attempted robbery but had no memory of the event or any of the events of the following 16 months.  (T. 375).  Plaintiff was diagnosed with dysthymic disorder, panic

disorder with agoraphobia and PTSD.  Plaintiff's GAF was 55.   Plaintiff was referred to Aimee

Gallin, LMSW.[2]

On June 9, 2010, plaintiff saw Ms. Gallin who noted that he was, "engaged in therapy,

appearing to be committed to process".  Ms. Gallin noted that plaintiff exhibited symptoms of

PTSD and fear and isolation as a result of being a member of the Latin Kings gang while he lived

in Boston. (T. 379).   Gallin referred plaintiff to Dr. Gonzalves for a psychiatric evaluation

however, there is no evidence in the record confirming that the evaluation took place.

**I.      Meet or Medically Equals a Listed Impairment**

A claimant is automatically entitled to benefits if her impairment(s) meets the criteria set

forth in Appendix 1 to Subpart P of Part 404. *McKinney v. Astrue*, 2008 WL 312758, *4

(N.D.N.Y. 2008).  The burden is on the plaintiff to present medical findings which show that her

impairments match a listing or are equal in severity to a listed impairment.  *Zwick v. Apfel*, 1998

WL 426800, at *6 (S.D.N.Y.1998).  In order to show that an impairment matches a listing, the

claimant must show that her impairment meets all of the specified medical criteria.  *Pratt v.*

*Astrue*, 2008 WL 2594430, at *6 (N.D.N.Y.2008) (citing *Sullivan v. Zebley*, 493 U .S. 521, 530

(1990)) (holding that if a claimant's impairment "manifests only some of those criteria, no matter

how severely," such impairment does not qualify).  Courts have required an ALJ to provide an

explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's

symptoms as described by the medical evidence appear to match those described in the Listings."

*Rockwood v. Astrue*, 614 F.Supp.2d 252, 273 (N.D.N.Y. 2009) (citation omitted).  If an ALJ's

decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court

---

[2] From the record, it appears that Conquet and Gallin are affiliated with Dr. Roth.

may still uphold the ALJ's determination if it is supported by substantial evidence. *Id.* (citing *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir.1982)).

"When evaluating the severity of mental impairments, the regulations require the ALJ to apply a 'special technique' at the second and third steps of the review, in addition to the customary sequential analysis." *Lint v. Astrue*, 2009 WL 2045679, at *4 (N.D.N.Y. 2009) (citing *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir.2008) (citing 20 C.F.R. § 404.1520a)). First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable mental impairment." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also Dudelson v. Barnhart*, 2005 WL 2249771, at *12 (S.D.N.Y. 2005). If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment [ ]." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). This process requires the ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and other evidence relevant to the impairment and its treatment. 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). If the first three areas are rated as "none" or "mild," and the fourth as "none," the ALJ will conclude that the mental impairment is not severe "unless the evidence otherwise

indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

In the decision, the ALJ found:

> There are insufficient clinical finding[s] to warrant application of any medical listings, including medical listing 12.05, as contained under section 12.00, which pertains to mental disorders.  In this regard, there is no objective documentation of marked limitations in any of the four Part B psychiatric review technique form (PRTF) categories that pertain to analysis of mental disorders. (T. 39).

The ALJ also noted:

> With respect to the claimant's mental status, the evidence shows a history of dysthymic disorder, borderline intellectual functioning, PTSD, and a history of polysubstance dependence and abuse in reported remission.  When considering these impairments within the context of medical listings 12.04, 12.05, 12.06 and 12.09, it is found that they result in mild limitations of the claimant's ability to conduct his activities of daily living and to maintain concentration, persistence and pace; and a moderate restriction for sustaining social functioning. There have been no episodes of decompensation shown within the objective medical evidence of record.  It is therefore concluded that the claimant is able to perform work that is comprised of simple, rote tasks, as would generally be associated with unskilled jobs; in a low-contact environment defined as not requiring greater than occasional interaction with co-workers and/or supervisors.  This assessment is generally consistent with the opinions as rendered at the previous level of administrative review. (T. 39-40).

Plaintiff claims that the ALJ erred when he failed to find that plaintiff's impairments met the listings for 12.03, 12.04, 12.05, 12.06 and 12.08.

**A.    Listings 12.03 (Schizophrenia); 12.04 (Affective Disorders); 12.06 (Anxiety Related Disorders); and/or 12.08 (Personality Disorder)**

Plaintiff claims that the record supports his diagnoses of PTSD, anxiety, schizophrenia, personality disorder and panic attacks and therefore, his impairments meet or equal the

requirements of Listings § 12.03[3], 12.04[4], 12.06[5] and 12.08[6].   Defendant argues that plaintiff did

---

[3] Listing 12.03 relates to Schizophrenic, Paranoid and Other Psychotic Disorders, "[c]haracterized by the onset of psychotic features with deterioration from a previous level of functioning. To meet the listed impairment, a claimant must satisfy the requirements in both A and B below, or must satisfy the requirements of C below:

A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
1. Delusions or hallucinations; or
2. Catatonic or other grossly disorganized behavior; or
3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
        a. Blunt affect; or
        b. Flat affect; or
        c. Inappropriate affect; or
4. Emotional withdrawal and/or isolation;
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

[4] Listing 12.04 provides:
        A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or
2. Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractibility; or
        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h. Hallucinations, delusions or paranoid thinking; or
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture

of both manic and depressive syndromes (and currently characterized by either or both syndromes); AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

[5] 12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

[6] 12.08 Personality Disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

not attempt to demonstrate that he met all the criteria of these listings.

To have an impairment that meets or medically equal 12.03 or 12.04, the claimant must satisfy both Paragraphs A and B or Paragraph C and in the case of § 12.06, satisfy Paragraphs A and B or both paragraphs A and C. *Stenoski v. Astrue,* 2009 WL 6055830, at *7 (N.D.N.Y. 2009). With respect to 12.08, plaintiff must meet both Paragraphs A and B. The Paragraph B criteria are the same under all of the aforementioned listings. *Id.* Plaintiff will only be disabled if his impairments are so marked that they preclude him from performing basic work activities. *See Armstrong v. Comm'r of Soc. Sec.*, 2008 WL 2224943, at * 12 (N.D.N.Y. 2008) (holding that even if the ALJ had determined that the plaintiff's depression was a medically determinable impairment, substantial evidence must exist to support a conclusion that the condition was severe and precluded the plaintiff from doing basic work activities).

While the record supports a diagnosis of PTSD, anxiety disorder and panic disorder, plaintiff does not meet the remaining criteria for the Listings. The ALJ rated plaintiff's limitations in the four functional areas and found mild limitations in "activities of daily living", "concentration, persistence, or pace" and moderate limitations in "social functioning". The ALJ also found no record of any decompensation. Plaintiff does not challenge or object to any of these findings and does not cite to any portion of the record that would support a marked

---

1. Seclusiveness or autistic thinking; or
2. Pathologically inappropriate suspiciousness or hostility; or
3. Oddities of thought, perception, speech and behavior; or
4. Persistent disturbances of mood or affect; or
5. Pathological dependence, passivity, or aggressivity; or
6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration

limitation in any of these functional areas.  *See Rushford-Spink v. Astrue*, 2010 WL 396359, at *

(N.D.N.Y. 2010) (the medical and non-medical opinions were consistent with the ALJ's

assessment and the plaintiff did not refute the findings).  Therefore, the Court finds that the ALJ

applied the proper legal standard and regulations and further, substantial evidence in the record

supports the ALJ's conclusion that plaintiff's impairments do not meet the aforementioned

listings.

### B.    Listing 12.05 (Mental Retardation)

Listing 12.05 states, in relevant part[7]:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> .     .     .
>
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.
>
> D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Plaintiff claims that he has a full scale IQ of 70 and that he was in special education

classes and only able to achieve his GED in his late twenties in an institutional setting.  Therefore,

---

[7] Plaintiff does not specify which subsection of 12.05 applies to his impairments.

plaintiff claims he meets the level of the aforementioned listing.  The Commissioner argues that plaintiff has not produced evidence of deficits in adaptive functioning required for a diagnosis of mental retardation.

Plaintiff must first show "significant subaverage general intellectual functioning with deficits in adaptive functions initially manifested during the developmental period", he then may attempt to satisfy one of the four sets of criterion listed in paragraphs A through D, demonstrating a sufficiently severe impairment. *See Mendez v. Astrue*, 2012 WL 3095587, at *3 (W.D.N.Y. 2012).  Deficits in adaptive functioning "denote[] an inability to cope with the challenges of ordinary everyday life". *Carrube v. Astrue*, 2009 WL 6527504, at *4 (N.D.N.Y. 2009) (citing *Novy v. Astrue*, 492 F.3d 708, 710 (7th Cir. 2007)). "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *Id*. at *5 (citing *West v. Comm'r of Soc. Sec. Admin*., 240 F. App'x 692, 698 (6th Cir. 2007) (unpublished decision)).  Courts have found circumstantial evidence, such as the following, sufficient to infer deficits in adaptive functioning prior to age 22: evidence a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math. *MacMillan v. Astrue*, 2009 WL 4807311, at *6 (N.D.N.Y. 2009) (citing, *inter alia, Christner v. Astrue*, 498 F.3d 790,793 (8th Cir.2007)).  A plaintiff who can dress, bathe, manage money, communicate effectively, do simple math and take care of personal needs does not suffer from adaptive deficits. *See Harris v. Comm'r of Soc. Sec*., 330 F. App'x 813, 815 (11th Cir. 2009).  An ALJ is entitled to consider plaintiff's work and social history including plaintiff's relationships when making a factual finding on this issue. *Ali v. Astrue*, 2010 WL 889550, at *6 (E.D.N.Y. 2010) (the record did not compel the conclusion that the plaintiff suffered from adaptive function deficits prior to the age of 22 because of a lack of diagnosis and the fact that the plaintiff worked

for many years).  Moreover, the fact that no medical professional actually diagnosed a claimant with mental retardation is relevant.  *Id*.

Here, the record does not contain any reports from any treating mental health professionals and no diagnosis of mental retardation.  The only evidence concerning plaintiff's mental impairments and/or cognitive abilities are consultative reports from Alex Gindes, Ph.D., and a Psychiatric Review Technique and Mental Residual Functional Capacity evaluation completed by H. Ferrin. The ALJ discussed plaintiff's activities of daily living which included "adaptive activities":

> the claimant is shown as remaining quite functional with respect to his activities of daily living.  He is fully independent in all respects of his self-care, including showering, grooming and dressing.  He can cook, clean, do laundry and shop.  He is able to drive a car, attend church services, and care for his sister's disabled daughter. (T. 41).

The ALJ discussed the fact that plaintiff has a high school education, attends AA and NA programs and handles his household chores. (T. 36, 38).  Additionally, the record reveals that plaintiff never received any psychological/psychiatric treatment or mental health counseling.  Plaintiff indicated that he composes music and keeps a written journal. (T. 40).  The record is devoid of any results of intelligence tests, administered at any age, other than the testing performed by Dr. Gindes.  While the ALJ did not specifically address the introductory paragraph, the evidence of record permits the Court to glean the rationale for the ALJ's decision.  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *see also Crane v. Astrue*, 369 F. App'x 915, 921 (10th Cir. 2010) ("[G]iven that [the plaintiff] had a GED and a steady work history, which included jobs at the semi-skilled and skilled levels, the ALJ understandably did not discuss this Listing).  Based upon the record, plaintiff does not suffer from an impairment beginning before age 22 that meets the introductory paragraph of Listing 12.05.

**II.    Residual Functional Capacity ("RFC")**

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

Here, the ALJ concluded that plaintiff had the residual functional capacity to perform medium work which is primarily comprised of simple, rote tasks in a low-contact environment and concluded that plaintiff could lift/carry up to 50 pounds occasionally, 25 pounds frequently and sit, stand and/or walk for six hours in an eight hour workday.

**1.    Impact of Plaintiff's L5 vertebral body**

Plaintiff argues that there is no support in the record for the Commissioner's finding that plaintiff could perform "medium work" including lifting and carrying up to 50 pounds occasionally and up to 25 pounds frequently.  Plaintiff relies upon the ALJ's finding that his L5 vertebral body was a severe impairment, his subjective complaints and Dr. Rocker's assessment.

Pursuant to the Regulations:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If

17

> someone can do medium work, we determine that he or she can also do sedentary and light work.

20 CFR § 404.1567.

The ALJ discussed plaintiff's low back pain and treatment:

> The claimant is documented as being fully neurologically intact, with no abnormalities of gait/stance. Although x-ray studies have shown a transitional vertebral body at L5, the claimant was described as having a full range of motion in his lower spine. Regarding his obesity, this has not affected his ability to walk, stand or sit given the lack of restrictions in these activities cited by Dr. Rocker. Thus, there is no objective basis for assessing an inability to perform the exertional requirements of medium work. (T. 40).

Upon review of the record, the Court finds that substantial evidence supports the ALJ's RFC assessment in this regard. Plaintiff does not object to the ALJ's decision to afford "substantial credence" to Dr. Rocker's conclusions. The ALJ's RFC assessment is consistent with, and actually more restrictive, than the Physical RFC Assessment completed by S. Kerner. Moreover, plaintiff's treating physician, Dr. Roth, did not provide any opinion with respect to plaintiff's ability to perform work related activities. Indeed, plaintiff's treatment and complaints regarding his lower back are sparse. Plaintiff did not cite to any portion of the record that supports his claim that he could not perform the full range of medium work.

## 2. Asthma

Plaintiff also claims that the ALJ failed to consider the impact that plaintiff's asthma had on his ability to perform work related functions. However, plaintiff's assertions are unsupported by the record. At step two of the sequential analysis, the ALJ found, "[t]he evidence does not substantiate severe impairments referable to asthma or hypertension". (T. 39). Moreover, Dr. Rocker performed a pulmonary function test and noted, "effort is submaximal. Results, nevertheless, show no respiratory impairment". (T. 286). There is no evidence in the record that

plaintiff's asthma impacts his ability to perform work related tasks.  Thus, the Court finds no error

in the ALJ's decision not to include this impairment in the RFC assessment.

### 3.      Non-exertional Impairments/Dr. Gindes' Opinions

Plaintiff also claims that the ALJ failed to consider plaintiff's severe non-exertional

impairments and that the RFC is inconsistent with Dr. Gindes' opinions.  The Court assumes,

from plaintiff's brief, that plaintiff objects to the weight that the ALJ afforded to Dr. Gindes'

opinions.[8]

The treating physician rule does not apply to consulting doctors. *See Jones v. Shalala*, 900

F.Supp. 663, 669 (S.D.N.Y. 1995); *see also Limpert v. Apfel*, 1998 WL 812569, at *6 (E.D.N.Y.

1998).  The ALJ may give significant weight to the opinions of consultative physicians if the

conclusions are well supported by clinical evidence; consistent with the overall record and

claimant's reported activities and based upon a thorough examination. *See Palaschak v. Astrue*,

2009 WL 6315324, at *6 (N.D.N.Y. 2009) (citing 20 C.F.R. 404.1527(f)).

In the decision, the ALJ discussed Dr. Gindes' assessment:

> The undersigned does not fully adopt the opinions of psychologist
> Gindes with regard to significant restrictions for interactions with
> others and maintaining a regular schedule.  Such contentions are not
> consistent with the result of his own mental status evaluation, or those
> of treating sources within evidence. (T. 41).

Upon a review of the record, the Court finds that the ALJ's decision to assign limited

weight to Dr. Gindes' opinions is supported by substantial evidence.  The ALJ was not required

to assign controlling weight to Dr. Gindes' opinions as he was a consulting physician who

examined the plaintiff on one occasion.  Moreover, Dr. Gindes' opinions are not supported by

---

[8] Plaintiff states, "[w]e believe that the Commissioner's RFC determination is wholly inconsistent with Dr. Gindes' determination of the claimant's non-exertional limitaions and the evidence in the record as a whole, and a remand is required to reconsider the claimant['s] true RFC". (Dkt. No. 11, p. 18).

objective medical evidence and the limitations expressed are not supported by Lisa Conquet and Aimee Gallin.  Indeed, there is no evidence that plaintiff received any mental health treatment other than one visit with Conquet and Gallin.  The Court finds no error in the ALJ's assessment of Dr. Gindes' opinion that would require remand in this matter.

### 4.    Subjective Complaints

Plaintiff also relies upon his subjective complaints of "crippling agoraphobia and social anxiety" and his "reported severe chronic back pain requiring the use of narcotic pain medication".  In the decision, the ALJ specifically found plaintiff's, "statements concerning the intensity, persistence and limiting effects of [his] symptoms [ ] not fully credible".  (T. 41).  Plaintiff has not challenged the ALJ's assessment of his credibility.  Plaintiff's own treating physician, Dr. Roth, continually diagnosed plaintiff with "panic disorder without agoraphobia". (T. 335, 343, 350, 355, 358).  Further, while plaintiff claims that he displays "marked limitations in the areas of sustained concentration and persistence, social interaction and adaptation", the record does not support that contention.

Based upon the aforementioned, the Court finds that substantial evidence supports the ALJ's RFC assessment.

## III.    Vocational Expert and the Medical-Vocational Guidelines

Plaintiff argues that the ALJ erred in failing to elicit vocational expert testimony in this case, and instead relying exclusively on the Medical-Vocational Guidelines, or "grids".  Plaintiff argues that the ALJ failed to consider his non-exertional impairments that prevent him from performing even simple, rote tasks in a low-contact environment.

Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability.  *Pratt v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996).  Generally speaking, if

a claimant suffers only from exertional impairments, then the Commissioner may satisfy his

burden by resorting to the applicable grids.[9]  *Id.* at 39.  The grids "take[ ] into account the

claimant's residual functional capacity in conjunction with the claimant's age, education and work

experience".  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).   Ordinarily, the ALJ need not

consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical

vocational guidelines (the grids)".  *Id.* at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).

The Second Circuit has held that "the mere existence of a nonexertional impairment does

not automatically require the production of a vocational expert or preclude reliance" on the

grids.[10]  *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).  The testimony of a vocational expert

that jobs exist in the economy which claimant can obtain and perform is required only when "a

claimant's nonexertional impairments significantly diminish his ability to work-over and above

any incapacity caused solely from exertional limitations-so that he is unable to perform the full

range of employment indicated by the medical vocational guidelines."  *Id.* at 605-06.  The use of

the phrase "significantly diminish" means the "additional loss of work capacity beyond a

negligible one or, in other words, one that so narrows a claimant's possible range of work as to

deprive him of a meaningful employment opportunity".  *Id.* at 606.  Rather, exclusive reliance on

the Grids will be deemed inappropriate only where the non-exertional impairments " significantly

limit the range of work permitted by his exertional limitations." *Id.* at 605-06 (emphasis added).

---

[9]  An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel*, 1998 WL 150981, at *10, n. 12 (S.D.N.Y. 1998).

[10]  A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); *see also Rodriguez*, 1998 WL 150981, at *10, n. 12.

"A claimant's work capacity is 'significantly diminished' if there is an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.' " *Bapp,* 802 F.2d at 606.

Under these circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Rosa*, 168 F.3d at 78 (quoting *Bapp,* 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question - whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. *Samuels v. Barnhart*, 2003 WL 21108321, at *12 (S.D.N.Y. 2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

In this case, the ALJ concluded:

> If the claimant had the residual functional capacity to perform the full range of medium work, considering his age, education and work experience, a finding of "not disabled" would be directed by Medical Vocational Rule 203.28. However, the additional limitations have little or no effect on the occupational base of unskilled medium work. (T. 42).

There is no evidence that plaintiff's non-exertional impairments resulted in limitations on plaintiff's ability to do medium work. Plaintiff does not cite to any portion of the record or any treatment note that indicates that plaintiff's non-exertional impairments significantly impacted his ability to perform work-related functions. As stated above, the RFC analysis is supported by substantial evidence. Therefore, the ALJ was permitted to rely on the Grids at the fifth step of the sequential evaluation to assess that there were a significant number of jobs in the light work

category in both the national and local economy that plaintiff could perform. *See* SSR 83-10; SSR 85-15; *see also* Bapp, 802 F.2d at 605.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:  February 7, 2013
         Albany, New York

Mae A. D'Agostino
U.S. District Judge